# NO. 12-14-00158-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *RICKY NEAL, JR.,*<br>*APPELLANT* | § | *APPEAL FROM THE 7TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *SMITH COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

Ricky Neal, Jr. appeals his conviction for murder, for which he was sentenced to imprisonment for life. Appellant raises nine issues challenging the trial court's rulings regarding the admissibility of certain evidence, the sufficiency of the evidence, the effectiveness of his trial counsel, and the trial court's rulings regarding certain jury instructions. We affirm.

### BACKGROUND

Appellant was charged by indictment with murder. He pleaded "not guilty," and the matter proceeded to a jury trial.

At trial, the evidence showed that Appellant went to the mall early one Saturday morning to buy some newly released tennis shoes. While inside the mall, Appellant encountered Jonathan Dews and had a verbal confrontation with him. The two men went into the parking lot. Some of their acquaintances, including Christopher Mass, also went to the parking lot. Appellant retrieved a .40-caliber handgun from his girlfriend's vehicle and shot Mass three times in the chest, neck, and face. Despite the efforts of bystanders to save Mass, he died at the scene.

Ultimately, the jury found Appellant "guilty" of murder and assessed his punishment at imprisonment for life. This appeal followed.

In Appellant's first issue, he argues that the State failed to prove his killing of Mass was not in self-defense.

## Standard of Review and Governing Law

The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence. *See Jackson v. Virginia*, 443 U.S. 307, 315-16, 99 S. Ct. 2781, 2786–87; *Brooks v. State*, 323 S.W.3d 893, 917 (Tex. Crim. App. 2010). The issue of self-defense is a fact issue to be determined by the jury, and a jury's verdict of guilt is an implicit finding that it rejected the defendant's self-defense theory. *Saxton v. State*, 804 S.W.2d 910, 913-14 (Tex. Crim. App. 1991). Accordingly, the jury's implicit rejection of a defendant's self-defense theory must be supported by legally sufficient evidence. *Id.* at 914. In reviewing the sufficiency of the evidence to support the jury's rejection of self-defense, we examine all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense and also could have found against the defendant on the self-defense issue beyond a reasonable doubt. *Id.*

When a defendant raises self-defense, he bears the burden of producing some evidence to support his defense. *See Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003) (citing *Saxton*, 804 S.W.2d at 913-14). Once the defendant produces some evidence supporting his defense, the state then bears the burden of persuasion to disprove the raised defense. *Id.* The burden of persuasion does not require the production of evidence; it requires only that the state prove its case beyond a reasonable doubt. *Id.* Moreover, "[d]efensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the [s]tate's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence." *Saxton*, 804 S.W.2d at 914. When contradictory testimonial evidence is before the jury, we defer to the jury's weight determinations. *Lancon v. State*, 253 S.W.3d 699, 706 (Tex. Crim. App. 2008).

To prove Appellant guilty of murder, the State was required to prove that he intentionally or knowingly caused Mass's death, or that he intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused Mass's death. *See* TEX. PENAL CODE ANN. § 19.02 (West 2011).

As applicable here, a person is justified in using deadly force in self-defense when and to the degree he reasonably believes deadly force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force. *Id.* §§ 9.31(a), 9.32(a)(2) (West 2011). A "reasonable belief" is that which "would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(42) (West Supp. 2015).

**The Evidence**

At trial, Dews testified that he went to the mall to buy shoes for his wife and children. When he arrived, he saw an acquaintance named Jimmy Whitt and spoke briefly to him about shoes. Dews then walked toward Foot Locker to see if it was open. Foot Locker was closed, so he walked back down the mall. Dews saw Mass standing by Whitt and spoke to him. Then he sat down at Chick-Fil-A and got on a website on his phone. Eventually, Whitt came over to speak to a woman at the table in front of Dews.

Dews stated that at some point, Appellant walked into Chick-Fil-A. Dews had never met Appellant, but the two men had a history. Dews had recently been in prison for delivery of a controlled substance. After his release, he and his wife, LaShaunda, reunited as a couple. Soon thereafter, Dews saw a Twitter message from Appellant to LaShaunda asking why she had gotten back together with Dews. Dews responded to Appellant's message, telling him to stay out of his business. On cross-examination, Dews did not deny sending "all sorts of nasty messages on Twitter" about Appellant in order to "get to him" for "worrying about [his] relationship." However, Dews denied saying any "fighting words" on Twitter.

Dews further testified that about two weeks before the shooting, he and LaShaunda went to Champs in the mall to buy shoes. The salesperson who assisted LaShaunda was acting strangely toward him, but Dews did not know who he was. After they left, LaShaunda told Dews that the salesperson was Appellant.

Dews testified that after Appellant walked into Chick-Fil-A on the day of the shooting, he began staring at Dews. Dews asked Appellant, "Do we have a problem?" Appellant replied, "You don't know me and I don't know you and we going to keep it that way." Dews asked Appellant what he meant, and Appellant repeated himself. Dews stood up and asked Appellant

3

what he was talking about. Appellant stood back and said, "I'm going to show you about me. I'm going to go put on my shoes."[1]

Dews said he took Appellant's statement to mean that he wanted to fight. After making the statement, Appellant walked toward the exit. He motioned for Dews to follow him and told him to "come on." Whitt stopped Dews and told him not to worry about Appellant, but Dews followed Appellant outside the mall to fight him. As Dews was leaving, Mass asked him what was going on. Mass then stopped to talk to a woman in the hallway that leads to the exit.

Dews said he continued out the exit alone. When Dews entered the parking lot, he saw Appellant unbuttoning his shirt. As Dews was walking toward him, Appellant told Dews that he should have come out alone. Dews then looked behind him and saw Mass. Dews took off his jacket and kept walking toward Appellant to fight. He got to within about five feet of Appellant. Mass walked to his car, took off his hoodie, and threw it in the car. He then went and stood at the back of his car with his arms crossed, about five feet from Dews. Appellant looked at Mass and asked him who he was. Mass replied, "I'm looking out for my homeboy." Appellant asked if they were trying to "jump" him, and Dews said "no." Appellant stated, "I'm going to show y'all about me."

Dews testified that Appellant then retrieved a gun from his car, cocked it, and pointed it at Mass. Dews raised his hands and said, "It ain't that type of party." Whitt ran up between Dews and Appellant trying to stop Appellant. Whitt told Appellant, "They're not trying to jump you." Dews backed up and grabbed his jacket. Dews looked at Mass and said, "I'm going to get him." Dews then heard gunshots and saw Mass fall. Dews ran toward some vehicles. As he was running, he looked back and saw Appellant point the gun at him. Dews heard another shot and fell to the ground. Appellant began walking toward Dews to see if he had shot him. Dews scooted around some vehicles. According to Dews, neither he nor Mass charged at Appellant when he pulled the gun, Appellant was the only person there with a gun, and no one used any force against Appellant.

Whitt testified that he arrived at the mall that day around 3:00 in the morning and went inside at about 7:00. He said he regularly attends the shoe releases at the mall to buy shoes for resale. He bought some shoes at Finish Line, and then he waited by a cabinet display near

---

[1] Evidence in the record shows that Appellant was wearing brown shoes and was dressed as if he were going to church. Appellant told the police that he was to attend the funeral of his aunt's father that day.

Champs with Mass—who was a friend of his—and someone named Quintin. Whitt said that Mass was also there to buy shoes. Whitt talked to Mass for about ten minutes and then walked over to Chick-Fil-A to speak to a woman. At some point, Dews came in and sat down at the next table. Whitt did not know Dews well, but he knew who he was. A few minutes later, Appellant walked up to Whitt and asked if he had his size in shoes. Whitt knew Appellant through his shoe reselling activities and from "seeing him out." They were on friendly terms.

Whitt said that Dews soon recognized Appellant and the two men got into a heated conversation. Appellant told Dews to "come outside if he wanted to box; his shoes was in the car." Whitt took Appellant's statement to mean that they were going to fight. Appellant walked toward the exit and "waved his hand like, 'Come on.'" Mass walked over to Chick-Fil-A, and then he and Dews started to walk outside.

Whitt testified that he asked Quintin to hold his shoes so he could try to stop Dews and Appellant from fighting. Whitt said this was because he did not want to see anyone go to jail that day. When Whitt walked outside, he saw Mass taking off his sweater with his car door open. He saw Dews standing at the back of Mass's car. And he saw Appellant on the other side of his car in the back seat. Whitt thought that Appellant was changing shoes. He told Appellant, "Man, y'all don't need to be doing this." Then Appellant came out of the back seat with a gun. He cocked the gun, walked toward Mass, and pointed the gun at him.

Whitt said that he told Appellant, "Man, put the gun down. If y'all going to fight, y'all going to fight. You don't need to have a weapon or whatever." But Appellant kept saying, "No. Y'all trying to jump me." Mass and Dews told Appellant, "No, we ain't trying to jump you." Mass had his hands up and said something like, "No, I ain't trying to jump you; I was just trying to make sure Dews was okay." Dews told Appellant, "I ain't trying to jump you. What you got the weapon for? Put the gun down. We can fight." Appellant asked, "Why he got his sweater off?" Then Appellant shot Mass in the chest, paused, and shot him two more times. By the third shot, Whitt began to run away. He heard about two more gunshots. Whitt said he never saw Mass or Dews charge at Appellant or go for a weapon, and he never saw any force used against Appellant.

Quintin Smith testified that he went to the mall on the day of the shooting to buy shoes. When he arrived, he saw Mass and Whitt at the display in front of Champs. Smith said that he "kinda" knew both of them. He was talking to them when they saw Appellant walk into the

mall.  Appellant began talking to someone at Champs.  At some point, Appellant looked over and saw Dews sitting at Chick-Fil-A.  He walked over to Dews, and they "g[o]t into it."  Appellant motioned for Dews to follow him outside.  Dews followed him out.  Mass, Whitt, and Smith also went outside.

Smith testified that he remained in the doorway and watched the events.  When Smith got to the door, he saw Appellant at his car, Dews parallel to a car between Mass's and Appellant's cars,[2] and Mass taking off his jacket and putting it in his car.  Appellant came from his car and immediately cocked a gun and pointed it at Mass.  At that point, Mass was behind his car, Dews was still to the side, and Whitt was somewhere in the middle.  Appellant said something like, "I told y'all I was going to be ready."  Whitt was trying to calm Appellant down and said something like, "It ain't even like that. Why you pulling a gun?"  Then Appellant shot Mass.  Smith immediately went inside to look for a security guard.  Smith said that he never saw anyone make any aggressive move toward Appellant, and Appellant was the only person he saw with a gun.

Tamra Norris testified that Appellant was her current boyfriend and had been her boyfriend for the last four years.  Norris said that she went to the mall with Appellant on the day of the shooting to buy shoes.  She parked to the right of a green vehicle and waited for Appellant to go in and get the shoes.  Appellant returned after a few minutes.  Norris said he told her to go inside and get the shoes.  He also told her, "These niggers tripping."  Appellant looked upset, but not unusually so.  He did not look afraid.

Norris testified that when she got out of the car, she saw that three men had followed Appellant out of the mall.  Appellant was standing on the passenger's side of Norris's car, Dews was standing at the end of the green car, and Mass was standing by the driver's side of the green car.  Norris saw Mass take off his hoodie and throw it into the car.  The third man was standing near the sidewalk with a phone or some other electronic device out. Norris heard Appellant say, "This is what you want to do?  This is what y'all want to do?"  By the time Norris reached the sidewalk, she heard the "racking of a gun."  She ran inside the side entrance of the mall.  Norris heard the gunshots from inside the hallway.  She found a security guard and told him that a

---

[2] The crime scene photographs show Mass's and Appellant's cars next to each other with no car in between.

shooting had occurred.  Norris said that she knew Appellant carried a gun and that he had not had it very long.  Norris never saw anyone else with a gun.

About an hour and a half after the shooting, Appellant gave a recorded interview at the police station.  He told the police that he went to the mall that day to buy shoes for himself and Norris.  Appellant worked at Champs, but he was not scheduled to work that day.  When he arrived at the mall, Appellant saw Whitt at Chick-Fil-A and went over to speak to him.  He noticed that Dews was seated close by.  Appellant said he acted as if Dews was not there.  Dews asked him his name, and Appellant said, "My name's Slick."[3] Dews then asked, "What's up man, you got a problem with me?"  Appellant replied, "No.  Do you have a problem with me?"  Dews said, "No, but I'm the one who tweeted about you."  Appellant said, "Yeah, I know that. But I talked to your girl.  She said everything was cool."

Appellant explained to the detective that he was friends with LaShaunda because he had previously dated her sister.  While Dews was in prison, LaShaunda told Appellant that she was going to divorce Dews.  Appellant tried to help LaShaunda through the situation with advice based on his experience.  When Dews was released, he and LaShaunda reunited.  About a month to a month and a half prior to the shooting, through direct messaging on Twitter, Appellant asked LaShaunda what was going on.  She told Appellant that she could change her mind if she wanted to, and he agreed.

Appellant said that he soon received a phone call informing him that someone said on Twitter, "Why is this nigga slick_em worried about my relationship?"  Appellant called LaShaunda and asked what was going on.  She said that Dews had seen the direct messages between her and Appellant, and he thought Appellant must want her since he was "worried" about her.  LaShaunda said she told Dews that was not the case.  She told Appellant not to "get into it" over her because that would be stupid.  Appellant told her, "After this day, I'm done with it."

Appellant said that when he saw Dews in the mall, Dews brought up the tweet, saying, "I did that, so what?"  Appellant said, "Man, look.  You don't even know me.  So I don't even know why you speaking on me.  I'm not like any of these other dudes out here, bro.  You don't scare me. I don't fear you, or nothing like that.  Just keep my name out of your mouth and we

---

[3] Appellant said that "Slick" is the name everyone calls him. He also said that "slick_em" is the name he used on Twitter.

good." Dews said, "But I did it again." Appellant said, "So tell me like this, man. What did you do it for?" Dews said, "Man, I don't even know you." Appellant said, "My point. You don't know me. So why are you even—Bro, I'm not worried about your relationship. I don't care about what y'all got going. I'm just down for a friend. She was letting me know that y'all are trying to work through y'all differences. That's cool." Dews said, "Man, whatever. I'm just saying though. And what? So what? I'll do it again. So what you want to do?" Appellant said, "Man, look. I ain't got time for this. I got a funeral to attend at eleven. I'm fixing to go out."[4]

Appellant said that he went outside where Norris was waiting in her car. He told her, "Man, these dudes in here tripping. Go in there and buy the shoes." Appellant went to the back seat on the passenger side to organize his things. He looked up and saw Mass taking off his hoodie. Appellant turned around and saw Dews directly behind him. Appellant said, "What are y'all doing, man?" Appellant unzipped a bag in the back seat and retrieved a gun. Dews was pacing around. Mass started walking around the corner of his car, and Appellant shot him. Dews ran away, and Appellant shot at him as well. Then Appellant called the police.

Later in the interview, Appellant added that Mass said something like, "I'm out here with him. It's whatever." Appellant said, "No. Why y'all walking up on me?" When Mass came around the corner, Appellant "drew down" on him. Dews immediately ran. Appellant shot Mass first because he thought he was coming from the car with "something." Then he shot at Dews. Appellant did not see a weapon. Appellant further explained the situation as follows:

> I was like, Dews, if you got a problem with me, that's cool. You know, I'm a man. So if you feel like you want to handle something one on one, or you want to talk to me one on one, that's understandable. But you got another dude with you. This dude done made it to his car. Now, I can't see through his car, so I don't know what he's going to the car for. I don't even know why this dude's out here. Because when we was in the mall, like I said, Dews was over here; this guy was over here. So I couldn't put it together . . . because I don't know the fellow. But all of a sudden, I look up and it's both of them outside. I know you got some animosity in your chest because when you come outside in the cold and you take off your shirt, I haven't said anything to you, now I'm in fear for my life. Because I don't know what you're going to do. You know, I don't know what y'all are going to do. My back is against the wall. I don't know what to—I mean, it's two dudes. . . . I had already told him, we established that we didn't have no problem. . . . Then all of a sudden, I look up and y'all done followed me out the mall. What am I to do? Your car door is open.

---

[4] Later in the interview, Appellant said that Dews stood up and said, "We'll do it right here." Appellant responded, "Naw man, I'm not even dressed for no type of occasion. I'm fixing to go." Still later in the interview, Appellant said that Dews told him they could go outside and fight, to which he responded, "Bro, I'm not even in no attire for that. I'm good. I don't know you. You don't know me. We're going to leave it at that."

Still later in the interview, Appellant again explained the events outside. He said that Mass threw his hoodie in the car. Dews said, "What's up?" Appellant did not know what Mass was coming around the corner with, so he shot him. He said that Dews was not a threat because he saw no weapon on him. Mass was the one not in clear view. Appellant figured if Mass had "the weapon," he should fire at him. He assumed Mass had a weapon because "why else would you go to your car." Appellant thought that he shot at Mass twice before turning to Dews. This time, Appellant said that Dews "started trying to catty corner and run" when Appellant started to point the gun at Dews. Then when Appellant fired, Dews ran. The detective asked Appellant why he shot at Dews if Dews did not have a weapon. Appellant responded, "I didn't know what he was going to do. I didn't know if the dude had a weapon in the car, or was Dews going to try to come back. . . . I felt my life was in danger."

The detective asked Appellant if he ever saw a weapon in anyone's hand, if he ever heard anyone say anything about a weapon, and if he ever heard anyone say that they were going to shoot, stab, or kill him. Appellant said he did not see a weapon or hear anyone talk about a weapon, and he did not remember hearing the words "I'll kill you." But he heard Mass say, "I'm out here with him. We do this shit." Appellant said that he had no idea what "shit" Mass was referring to, but he took the statement as a threat to his life.

Appellant denied saying "So this is what you want to do?" before firing the gun. He also said that he did not remember Whitt coming up to him and saying anything, but he did not deny that it happened. Appellant said he bought the gun about two to three weeks prior to the shooting.

**Analysis**

Appellant argues that the evidence is insufficient to overcome his self-defense claim because there is evidence that he was in fear for his life when he shot Mass, and that the State presented no evidence that he was unjustified in arming himself with a deadly weapon. He contends that the greater weight and preponderance of credible evidence shows that he acted in self-defense from the apparent danger of multiple assailants. Appellant further argues that the jury's rejection of his self-defense claim was not rational because it is undisputed that Mass and Dews were large men who were the aggressors in the incident and followed him outside to fight him. We disagree.

Even though Appellant asserted in his interview that he was in fear for his life because he assumed Mass had retrieved a gun from his car, the jury was not required to find him "not guilty." *See Saxton*, 804 S.W.2d at 914. Based on other evidence in the record, a rational jury could have found that Appellant was not in fear for his life, or that if he was, any belief that deadly force was immediately necessary to protect him against anyone's use or attempted use of unlawful deadly force was unreasonable. *See id.*; TEX. PENAL CODE ANN. §§ 9.31(a), 9.32(a)(2). Contrary to Appellant's assertion that he and Dews "established there was no problem" before he went outside, Dews, Whitt, and Smith all testified that Appellant invited Dews outside to fight. Dews and Whitt said that Appellant told Dews he was going to go "put on his shoes." Investigator Donald Malmstrom testified that he personally searched Norris's car and did not find any shoes.

All of the evidence, including Appellant's statements in the interview, shows that no one besides Appellant had a weapon, and no one made any aggressive move toward Appellant. Whitt, who was friendly with all parties involved, testified that when Appellant aimed his gun at Mass, Whitt tried to calm Appellant down, and Appellant persisted in killing Mass. Based on all of the evidence, a rational jury could believe that Appellant lured Dews to his car to kill him or scare him with the gun. The jury could further believe that Appellant never believed deadly force was immediately necessary to protect himself against any unlawful deadly force, but that he killed Mass simply because he might try to lawfully defend Dews. Having examined the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could find against Appellant on the self-defense issue beyond a reasonable doubt.

Appellant also argues that even though the evidence shows he shot Mass three times, it is insufficient to show he intended to cause his death or serious bodily injury. In the light most favorable to the verdict, the evidence shows that Appellant pointed a .40-caliber semiautomatic handgun at Mass and fired three hollow point bullets into his chest, neck, and face. He then fired at Dews as he was running away. We conclude that a rational trier of fact could have found beyond a reasonable doubt that Appellant intended to cause Mass's death or serious bodily injury. Therefore, the evidence is legally sufficient to support Appellant's conviction. We overrule Appellant's first issue.

## EXCLUSION OF EVIDENCE

In Appellant's second, third, and sixth issues, he complains that the trial court erred by excluding certain testimony he attempted to elicit.

## Standard of Review

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. **Torres v. State**, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002). We must uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. **Willover v. State**, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002). We will not reverse a trial court's ruling admitting or excluding evidence unless that ruling falls outside the zone of reasonable disagreement. *See* **Torres**, 71 S.W.3d at 760.

## Evidence of Mass's Alleged Gang Affiliation

Several months prior to trial, the trial court granted the State's motion in limine to have the attorneys approach the bench before any mention that Mass might have been a member of, or associated with, a criminal street gang. At trial, after opening statements, Appellant argued at the bench for the admission of such testimony. He claimed the State gave him a letter from its gang expert through the discovery process. Appellant believed, based on the letter and on conversations with the expert, that there was strong evidence Mass was a member of the West Side Rolling Crips or Rolling Sixties street gang. He argued this evidence would show Mass's intent. The State argued that the evidence was not relevant because Appellant had no idea who Mass was, and because Mass made no aggressive move toward Appellant. The trial court researched the issue and told the parties that, based on its research and on the current state of the evidence, it was excluding any evidence of Mass's alleged gang affiliation at that point.

Appellant later attempted to elicit evidence of Mass's alleged gang affiliation from three different witnesses. He asked the witnesses how they knew Mass. One responded, "through friends." Another responded, "from the streets." And the third responded, "being out, clubs, stuff like that." Appellant pressed the witnesses for clarification. The State objected that the line of questioning was irrelevant and invited improper character evidence. Appellant argued that the evidence was relevant if it showed Mass was associating with criminals, and that the witnesses' responses opened the door to further inquiry. The trial court allowed Appellant to inquire further into how the witnesses knew Mass for the purpose of showing bias or prejudice, but it maintained its ruling excluding evidence of Mass's alleged gang affiliation.

11

When a defendant is charged with an assaultive offense, he may offer evidence concerning the victim's character for violence or aggression under two distinct theories. *Ex parte Miller*, 330 S.W.3d 610, 618 (Tex. Crim. App. 2009). First, the defendant may offer reputation or opinion testimony, or evidence of specific prior acts of violence by the victim, to show the reasonableness of the defendant's claim of apprehension of danger from the victim. *Id.* This is called communicated character evidence because the defendant must be aware of the victim's violent tendencies and perceive a danger posed by him, regardless of whether the danger is real. *Id.*

Second, the defendant may offer evidence of the victim's character for violence to show that the victim was the first aggressor. *Id.* This is called uncommunicated character evidence because the defendant need not be aware of the victim's violent tendencies. *Id.* Evidence offered under this theory is limited to reputation and opinion testimony. *Id.*

Evidence of the victim's prior specific acts of violence may be offered under a different rationale. *Id.* It may be offered for a noncharacter purpose—such as his specific intent, motive to attack the defendant, or hostility—under Rule 404(b). *Id.* Specific acts of violence may also be offered to show that the deceased was the first aggressor, but only if there is some evidence of a violent or aggressive act by the deceased that tends to raise the issue of self-defense and that the specific act may explain. *Torres*, 71 S.W.3d at 761.

In Appellant's second issue, he argues that he was entitled to offer evidence of Mass's gang affiliation regardless of the undisputed fact that he did not know Mass and was unaware of any character he might have for violence. He contends that such evidence could lead a jury to conclude his use of force was reasonable because he had reason to believe Mass would use unlawful deadly force. However, Mass's alleged gang affiliation could not cause Appellant to believe anything about Mass if he did not know about it. We have found no evidence in the record that Appellant knew Mass or anything about him. In Appellant's recorded statement to the police, he repeatedly states that he does not know Mass. Therefore, the evidence of Mass's alleged gang affiliation is not admissible as communicated character evidence. *See Miller*, 330 S.W.3d at 618.

Appellant further argues that the evidence is admissible under Texas Rule of Evidence 404(b) for the noncharacter purpose of establishing Mass's specific intent or motive to attack Appellant. While evidence of a victim's prior specific acts of violence may be offered under

12

Rule 404(b) to show his specific intent or motive to attack the defendant, the evidence of Mass's gang affiliation does not constitute a prior specific act of violence. *See Torres*, 71 S.W.3d at 761. Therefore, the evidence was not admissible under Rule 404(b). We conclude that the trial court did not err by excluding evidence of Mass's alleged gang affiliation. Accordingly, we overrule Appellant's second issue.

In Appellant's third issue, he argues that his right to confrontation was violated by the trial court's limitation of his cross-examination of witnesses regarding Mass's alleged gang affiliation. The Sixth Amendment to the Constitution of the United States guarantees the right of the accused to be confronted with the witnesses against him. A primary interest secured by the Confrontation Clause is the right of cross-examination. *Lopez v. State*, 18 S.W.3d 220, 222 (Tex. Crim. App. 2000). Each Confrontation Clause issue is examined by carefully weighing the defendant's right of cross-examination and the risks of admitting the evidence. *Id.* In weighing whether evidence must be admitted under the Confrontation Clause, a trial court should balance the probative value of the evidence against the risks of admitting it. *Id.* The trial court maintains broad discretion to impose reasonable limits on cross-examination to avoid harassment, prejudice, confusion of the issues, endangering the witness, and the injection of cumulative or collateral evidence. *Id.*

Appellant contends that the trial court's limitation on his cross-examination of the witnesses regarding Mass's alleged gang affiliation greatly limited his ability to establish his self-defense claim. But, as we previously observed, the evidence in the record shows that Appellant did not know Mass or anything about him. Thus, any evidence of Mass's gang affiliation has very low probative value because it has no bearing on the reasonableness of Appellant's apprehension of danger from him. Under these circumstances, we conclude that the Confrontation Clause does not demand the admissibility of this evidence. *See id.* Accordingly, we overrule Appellant's third issue.

## Mall Walker's Testimony

On the morning of the shooting, Wilmon Davis was walking in the mall for exercise. Davis saw about twelve people standing in the area in front of Champs and JCPenney. On his last round, he thought he heard one of them say, "He might get shot." At trial, the State objected to this testimony on relevance and hearsay grounds. Appellant argued that the statement was admissible under the hearsay exceptions of present sense impression, excited utterance, and

statement against interest, as well as under the Confrontation Clause. The trial court sustained the State's hearsay objection.

Hearsay is generally not admissible. *See* TEX. R. EVID. 802. Once an opponent of hearsay objects, it becomes the burden of the proponent to establish that an exception makes the hearsay admissible. *Taylor v. State*, 268 S.W.3d 571, 578-79 (Tex. Crim. App. 2008). One such exception, known as present sense impression, is for a "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." TEX. R. EVID. 803(1). The rationale for the exception stems from the statement's contemporaneity, not its spontaneity. *Rabbani v. State*, 847 S.W.2d 555, 560 (Tex. Crim. App. 1992). Because of their contemporaneity, statements of present sense impression possess the following safeguards: (1) safety from any error from defect of memory of the declarant, (2) little or no time for calculated misstatement, and (3) opportunity for the witness who reports the statement to check for a misstatement. *Id.*

In Appellant's sixth issue, he argues that Davis's statement is admissible as a present sense impression. He contends that the statement's relevance is to show that "Mass and his group of thugs were the aggressors" and to show the "motive and intent of the group of gangsters in the mall." Davis's statement does not show either of these things. On a bill of exceptions, Davis testified only that he "thought" he heard the words "he might get shot." He also testified that he did not know who made the statement. Even if the declarant indeed said, "he might get shot," there is no evidence in the record of who "he" is—Appellant, Mass, or someone else. Therefore, we conclude that Appellant has not shown how the statement is relevant to his defense.

Furthermore, although Appellant contends that the statement is a present sense impression, he has not shown what event or condition the declarant was perceiving and describing or explaining when he made the statement. Therefore, we conclude that the trial court did not err by excluding the statement on hearsay grounds despite Appellant's claim that it was a present sense impression. *See Wood v. State*, 18 S.W.3d 642, 652 (Tex. Crim. App. 1992) (hearsay statement of Appellant telling codefendant to "leave all the guns at home" because "they weren't going to go through with it" was not present sense impression where Appellant failed to show what event or condition he was perceiving at the time); *see also Beauchamp v. State*, 870 S.W.2d 649, 652 (Tex. App.—El Paso 1994, pet. ref'd) (hearsay statement of police

14

officer that he did not believe Appellant was intoxicated was not present sense impression where statement was not description or explanation of something contemporaneously observed, but was opinion that involved reflection on earlier observations). Accordingly, we overrule Appellant's sixth issue.

**C<small>HARGE</small> E<small>RROR</small>**

In Appellant's fourth issue, he argues that the trial court erred by instructing the jury on instances where force is not justified by self-defense. In Appellant's fifth, eighth, and ninth issues, he argues that the trial court erred by denying his requested instructions on necessity, lesser included offenses, and sudden passion.

**Standard of Review**

The review of an alleged jury charge error in a criminal trial is a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). First, an appellate court must determine whether there was error in the jury charge. *Id.* Then, if there is charge error, the court must determine whether there is sufficient harm to require reversal. *Id.* at 731-32. The standard for determining whether there is sufficient harm to require reversal depends on whether the appellant objected to the error at trial. *Id.* at 732.

If the appellant objected to the error, the appellate court must reverse the trial court's judgment if the error "is calculated to injure the rights of the defendant." T<small>EX</small>. C<small>ODE</small> C<small>RIM</small>. P<small>ROC</small>. A<small>NN</small>. art. 36.19 (West 2006). This means no more than that there must be some harm to the accused from the error. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). An appellant who did not raise the error at trial can prevail only if the error is so egregious and created such harm that he has not had a fair and impartial trial. *Id.* "In both situations the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.*

The record must show that the defendant suffered actual harm, not merely theoretical harm. *Id.* at 174. In assessing whether the trial court erred by denying a requested defensive instruction, an appellate court must examine the evidence offered in support of the defensive issue in the light most favorable to the defense. *Farmer v. State*, 411 S.W.3d 901, 906 (Tex. Crim. App. 2013).

15

## Instruction Limiting Self-Defense Charge

In Appellant's fourth issue, he contends that the trial court erred by limiting his claim of self-defense in the jury charge. The charge included an instruction on self-defense and the following limitation to self-defense:

> The use of force against another is not justified (1) in response to verbal provocation alone; or (2) if the actor consented to the exact force used or attempted by the other; or (3) if the actor provoked the other's use or attempted use of unlawful force; or (4) if the actor sought an explanation from or discussion with the other person concerning the actor's differences with the other person while the actor was unlawfully carrying a handgun.
>
> A person commits the offense of unlawfully carrying a handgun if the person intentionally, knowingly, or recklessly carries on or about his or her person a handgun if the person is not (1) on the person's own premises or premises under the person's control; or (2) inside of or directly en route to a motor vehicle that is owned by the person or under the person's control.

When a defensive issue is raised by the evidence and a charge on the issue is properly requested, the issue must be submitted to the jury. *Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993). If raised by the evidence and requested by the state, an instruction limiting a self-defense charge is warranted. *Williams v. State*, 35 S.W.3d 783, 786 (Tex. App.—Beaumont 2001, pet. ref'd). In reviewing the propriety of a limiting instruction, we view the evidence in the light most favorable to giving the instruction. *Fink v. State*, 97 S.W.3d 739, 743 (Tex. App.—Austin 2003, pet. ref'd).

Appellant argues that no evidence raised the portion of the limiting instruction given under penal code section 9.31(b)(5)(A). Under that section, "[t]he use of force against another is not justified . . . if the actor sought an explanation from or discussion with the other person concerning the actor's differences with the other person while the actor was . . . carrying a weapon in violation of Section 46.02." TEX. PENAL CODE ANN. § 9.31(b)(5)(A) (West 2011).

Appellant contends that no evidence presented at trial shows Appellant sought an explanation or discussion with Mass or Dews at the time he armed himself with the gun. We disagree. In the light most favorable to giving the limiting instruction, the evidence shows that Appellant was concerned, at least to some degree, about Dews talking about him on Twitter. Shortly thereafter, Appellant purchased a handgun. A few weeks later, Appellant saw Dews at the mall, went over to him, and began staring at him. Dews asked if there was a problem, and the two had a heated discussion. Appellant told Dews to come outside so he could change his

16

shoes. There were no shoes in the car. When Appellant arrived at the car, he reached into the backseat where his gun was located. He looked up and saw Mass at his car. Appellant retrieved his gun and began to question Mass and Dews as to who Mass was and whether they were trying to "jump" him. From this evidence, the jury could have concluded that Appellant initially sought to continue his discussion with Dews about the tweets while intimidating him with the gun, and then sought an explanation as to who Mass was and what their intentions were.

Appellant also argues that there is no evidence to support a finding that he was carrying the gun unlawfully. Appellant contends that because he was not a convicted felon at the time, because he was not involved in any criminal activity, because the gun was not in plain view in the car, and because it was not shown that he was a member of any known street gang, there is no evidence that he was carrying the weapon unlawfully. However, the jury could have concluded that Appellant was unlawfully carrying the weapon because he was not on his own premises or premises under his control, or inside of or directly en route to his own motor vehicle or a motor vehicle under his control. *See id.* § 46.02(a) (West Supp. 2015). Therefore, we conclude that the trial court did not err by giving the limiting instruction under penal code section 9.31(b)(5)(A).

Appellant further argues that no evidence raised the portion of the limiting instruction given under penal code section 9.31(b)(4). Under that section, "[t]he use of force against another is not justified . . . if the actor provoked the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(b)(4) (West 2011).

Generally, if the issue is not raised by the facts, an instruction on provoking the difficulty is an unwarranted limitation on the right of self-defense. *Matthews v. State*, 708 S.W.2d 835, 837 (Tex. Crim. App. 1986). Viewing the evidence in the light most favorable to the verdict, an instruction on provoking the difficulty is properly given when (1) self-defense is an issue, (2) there is evidence in the record that the deceased made the first attack on the defendant, and (3) the defendant did some act or used some words intended to and calculated to bring on the difficulty in order to have a pretext for inflicting injury on the deceased. *Id.* at 837-38. The defendant must have a specific intent to goad the victim into attacking the defendant so that the defendant can then kill or injure the victim. *Bennett v. State*, 726 S.W.2d 32, 35 (Tex. Crim. App. 1986).

17

Appellant contends that no evidence shows he provoked either Mass or Dews to use force. There is evidence in the record to support a finding that Appellant provoked a difficulty with Dews by inviting him outside for a fight. But the question here is whether Appellant had the specific intent to goad Mass—the victim—into attacking him so that he could then kill or injure Mass. *See* TEX. PENAL CODE ANN. § 9.31(b)(4); *Matthews*, 708 S.W.2d at 838; *Bennett*, 726 S.W.2d at 35. We have found no evidence in the record to support such a finding. In Appellant's police interview, he states that he does not know Mass and did not know that Mass and Dews knew each other until he saw them both in the parking lot. There is no evidence in the record showing otherwise. Therefore, we conclude that the instruction on provoking the difficulty was given in error.

Because Appellant objected at trial to the instruction on provoking the difficulty, the record must show only that he suffered some harm to obtain a reversal. *See Almanza*, 686 S.W.2d at 171. Appellant argues that he was harmed by the instruction because it denied him the right to present the issues of self-defense and multiple assailants and left the jury no alternative but to convict. However, the record shows that Appellant's defense attorney argued strongly in favor of self-defense and multiple assailants. And the jury charge included self-defense and multiple assailants instructions. We conclude that the instruction on provoking the difficulty did not harm Appellant by denying him the right to present the issues of self-defense and multiple assailants, or by leaving the jury no alternative but to convict.

Furthermore, although the State requested the instruction on provoking the difficulty, its theory was that no force was used against Appellant, and therefore there was no self-defense. All of the evidence supports this theory, except for Appellant's assertion in his interview that he was in fear for his life. Appellant's alleged reason for believing that his life was in danger was because Mass went to his car, removed his hoodie, said "we do this shit," and walked around the corner. These facts are weak evidence, if any, of self-defense. The State essentially argued that Appellant lured Dews out with the challenge to fight when all along his goal was to kill him, and that he shot Mass without any reasonable belief that he was under an attack with unlawful deadly force. Without a reasonable belief of attack by Mass, self-defense is not raised, and thus neither is provoking the difficulty. After reviewing the record, we conclude it does not show that Appellant was harmed by the instruction on provoking the difficulty. *See id.* Accordingly, we overrule Appellant's fourth issue.

18

**Necessity Instruction**

In Appellant's fifth issue, he argues that the trial court erred by denying his request for an instruction on the defense of necessity. He contends that when the evidence is viewed in the light most favorable to him, the circumstances surrounding the shooting support his reasonable belief that Mass and Dews would cause him serious bodily injury unless he resorted to deadly force.

"A defendant is entitled to an instruction on every defensive issue raised by the evidence, regardless of whether the evidence is strong, feeble, unimpeached, or contradicted, and even when the trial court thinks that the testimony is not worthy of belief." ***Walters v. State***, 247 S.W.3d 204, 209 (Tex. Crim. App. 2007). "This rule is designed to insure that the jury, not the judge, will decide the relative credibility of the evidence." ***Granger v. State***, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999). To raise a defensive issue, the evidence must raise each element of the defense. ***Stefanoff v. State***, 78 S.W.3d 496, 499 (Tex. App.–Austin 2002, pet. ref'd). "If evidence is such that a rational juror could accept it as sufficient to prove a defensive element, then it is said to 'raise' that element." ***Id.***

"When evidence from any source raises a defensive issue, and the defendant properly requests a jury charge on that issue, the trial court must submit the issue to the jury." ***Muniz v. State***, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993). "Thus, if the issue is raised by any party, refusal to submit the requested instruction is an abuse of discretion." ***Darty v. State***, 994 S.W.2d 215, 218 (Tex. App.–San Antonio 1999, pet. ref'd). When reviewing a trial court's refusal to submit a defensive instruction, we view the evidence in the light most favorable to the requested instruction. ***Bufkin v. State***, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006).

> The Penal Code provides that
>
> [c]onduct is justified if:
> (1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;
> (2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and
> (3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

TEX. PENAL CODE ANN. § 9.22 (West 2011). "The requirements of subsections 9.22(1) and (2) must be satisfied by evidence, while subsection (3) presents a question of law." ***Pennington v. State***, 54 S.W.3d 852, 857 (Tex. App.–Fort Worth 2001, pet. ref'd). Additionally, "a defendant must admit to the conduct—the act and the culpable mental state—of the charged offense to be

entitled to a necessity instruction." ***Juarez v. State***, 308 S.W.3d 398, 399 (Tex. Crim. App. 2010).

A "reasonable belief" is one "that would be held by an ordinary and prudent man in the same circumstances as the actor." TEX. PENAL CODE ANN. § 1.07(a)(42). "'Imminent' means something that is impending, not pending; something that is on the point of happening, not about to happen." ***Pennington***, 54 S.W.3d at 857. "Harm is imminent when there is an emergency situation and it is 'immediately necessary' to avoid that harm." ***Id.*** "In other words, a split-second decision is required without time to consider the law." ***Id.***

"Evidence of a generalized fear of harm is not sufficient to raise the issue of imminent harm." ***Brazelton v. State***, 947 S.W.2d 644, 648 (Tex. App.–Fort Worth 1997, no pet.). If undisputed facts indicate a complete absence of immediate necessity or imminent harm, a defendant's belief that his conduct is immediately necessary to avoid imminent harm is unreasonable as a matter of law. ***Dewalt v. State***, 307 S.W.3d 437, 454 (Tex. App.–Austin 2010, pet. ref'd).

Here, the undisputed facts indicate a complete absence of immediate necessity or imminent harm. In the light most favorable to giving the necessity instruction, the evidence shows that Appellant and Dews had a verbal altercation inside the mall. Dews challenged Appellant to fight him either inside or outside the mall. Appellant declined the offer and went outside to the parking lot. Appellant reached into the backseat of Norris's car to organize his things. He heard Mass say, "I'm out here with him. We do this shit." Appellant looked up and saw Mass take off his hoodie and throw it into the car next to Norris's. Appellant turned around and saw Dews close behind him. Appellant asked what they were doing. Dews began pacing around. Appellant unzipped his bag and pulled out his gun. Appellant asked why they were "walking up on" him. He told Dews, "We established we had no problem. Then all of a sudden, I look up and y'all done followed me out the mall." Mass walked around the corner of his car. When Mass got to the back of his car, Appellant shot him because he "assumed he come around the car with a weapon." He assumed this because he could see no other reason for Mass to go to his car. He then shot Mass two more times and shot at Dews as Dews was turning to run. Appellant never saw a weapon in anyone's hand and never heard anyone mention a weapon.

None of the evidence in the record, including Appellant's own statements, supports a finding that Appellant reasonably believed his conduct in firing a .40-caliber weapon loaded with

hollow point bullets three times at an unarmed man was immediately necessary to avoid any kind of imminent harm. Appellant claimed he thought Mass must have gone to his car to retrieve a weapon. But his statements show that he knew Mass went to his car to throw his hoodie inside it. Appellant had no reason to assume that Mass had a weapon and was about to use it on him, and the mere possibility of harm does not suffice to raise a necessity defense. ***Boushey v. State***, 804 S.W.2d 148, 151 (Tex. App.—Corpus Christi 1990, pet. ref'd). Therefore, the trial court did not err by denying Appellant's request for a necessity instruction. Accordingly, we overrule Appellant's fifth issue.

## Lesser Included Offense Instructions

In Appellant's eighth issue, he argues that the trial court erred by denying his requests for lesser included offense instructions on manslaughter, criminally negligent homicide, and deadly conduct. We apply a two-step process to determine whether a defendant was entitled to an instruction on a lesser offense. ***Cavazos v. State***, 382 S.W.3d 377, 382 (Tex. Crim. App. 2012). First, we determine whether the offense qualifies as a lesser included offense under Texas Code of Criminal Procedure Article 37.09. ***Sweed v. State***, 351 S.W.3d 63, 68 (Tex. Crim. App. 2011). This is a question of law. ***Hall v. State***, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007). Next, we determine whether there is some evidence that would have permitted the jury to rationally find that if the defendant was guilty, he was guilty only of the lesser offense. ***Id.*** at 536.

Although the threshold showing for an instruction on a lesser included offense is low—more than a scintilla of evidence—the evidence must establish that the lesser included offense is a valid and rational alternative to the charged offense. ***Id.*** "[I]t is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense; there must be some evidence directly germane to a lesser included offense for the factfinder to consider before an instruction on a lesser included offense is warranted." ***Bignall v. State***, 887 S.W.2d 21, 24 (Tex. Crim. App. 1994).

A person commits murder, in pertinent part, if he

(1) intentionally or knowingly causes the death of an individual, or

(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE ANN. § 19.02(b)(1), (2).

21

A person acts "intentionally" with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a) (West 2011). A person acts "knowingly" with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. *Id.* § 6.03(b) (West 2011). A person acts "knowingly" with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.*

A person commits manslaughter if he recklessly causes the death of an individual. *Id.* § 19.04(a) (West 2011). A person acts "recklessly" with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. *Id.* § 6.03(c) (West 2011). The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. *Id.*

A person commits criminally negligent homicide if he causes the death of an individual by criminal negligence. *Id.* § 19.05(a) (West 2011). A person acts with criminal negligence with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. *Id.* § 6.03(d) (West 2011). The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. *Id.*

A person commits deadly conduct, in pertinent part, if he

(1) recklessly engages in conduct that places another in imminent danger of serious bodily injury, or

(2) knowingly discharges a firearm at or in the direction of one or more individuals.

*Id.* § 22.05(a), (b)(1) (West 2011).

The parties correctly agree that, as charged, manslaughter, criminally negligent homicide, and deadly conduct are lesser included offenses of murder. *See Cavazos*, 382 S.W.3d at 384; *Flores v. State*, 245 S.W.3d 432, 440 (Tex. Crim. App. 2008). Therefore, the first prong is met.

Regarding the second prong, Appellant argues that the jury could have relied on his statement to the police that he had no intent to kill Mass as evidence to find him guilty only of

manslaughter or criminally negligent homicide. We disagree. The undisputed evidence shows that Appellant pointed the gun directly at Mass and shot him three times. Appellant stated that he shot Mass because he assumed he had a gun. Under these circumstances, his later statement that he did not intend to kill Mass does not rationally support an inference that he acted recklessly or negligently in firing the gun. *See Cavazos*, 382 S.W.3d at 385 (no inference of recklessness where defendant pulled out a gun, pointed it at victim, pulled trigger twice, fled the country, and later told friend "I didn't mean to shoot anyone"). The evidence shows that Appellant intentionally shot and killed Mass, and there is no evidence in the record that would have permitted the jury to rationally find that if Appellant is guilty, he is guilty only of manslaughter or criminally negligent homicide. Accordingly, the trial court did not err in refusing to instruct the jury on the lesser included offenses of manslaughter and criminally negligent homicide.

Furthermore, Appellant directs us to no evidence in the record that supports a finding that if Appellant is guilty, he is guilty only of deadly conduct. It is undisputed that Appellant's conduct caused Mass's death. Therefore, if Appellant is guilty, he is guilty of at least some form of homicide. *See Jackson v. State*, 992 S.W.2d 469, 475 (Tex. Crim. App. 1999). Consequently, the trial court did not err by denying Appellant's request for an instruction on deadly conduct. *See id.* (no error in refusing to charge on aggravated assault where evidence showed defendant at least guilty of homicide). Accordingly, we overrule Appellant's eighth issue.

## Sudden Passion Instruction

In Appellant's ninth issue, he contends that the trial court erred by denying his request for a sudden passion instruction in the punishment phase of his trial. He argues that his statements to the police that he was in fear for his life raise the sudden passion issue. Appellant contends that the evidence shows he acted under the immediate influence of sudden passion arising from the fact that two large individuals followed him out of the mall to fight him after a heated verbal exchange.

At the punishment phase of a murder trial, the defendant may raise the issue of whether he caused the victim's death under the immediate influence of sudden passion arising from an adequate cause. *See* TEX. PENAL CODE ANN. § 19.02(d). "Sudden passion" is defined as "passion directly caused by and arising out of provocation by the individual killed or another

acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2). The mere fact that a defendant acts in response to the provocation of another is not sufficient to warrant a charge on sudden passion. *Trevino v. State*, 100 S.W.3d 232, 241 (Tex. Crim. App. 2003).

"Adequate cause" is cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. TEX. PENAL CODE ANN. § 19.02(a)(1). Adequate cause is not determined by considering the defendant's peculiar conditions, such as low mentality or unstable emotions. *See Gonzales v. State*, 689 S.W.2d 900, 904 (Tex. Crim. App. 1985). Instead, adequate cause is determined by applying the "person of ordinary temper" standard, which is the same as the reasonable person standard. *See id.* at 903.

To justify a jury instruction on the issue of sudden passion at the punishment phase, the record must at least minimally support an inference that (1) the defendant in fact acted under the immediate influence of a passion such as terror, anger, rage, or resentment; (2) his sudden passion was in fact induced by some provocation by the deceased or another acting with him, which provocation would commonly produce such a passion in a person of ordinary temper; (3) he committed the murder before regaining his capacity for cool reflection; and (4) a causal connection existed between the provocation, passion, and homicide. *Wooten v. State*, 400 S.W.3d 601, 605 (Tex. Crim. App. 2013).

In this case, video evidence shows Appellant calmly, albeit somewhat quickly, walking out of the mall after the verbal altercation. It shows Dews and Mass calmly walking a number of yards behind him. According to Appellant in his interview, Dews appeared behind him while he was organizing things in his backseat. Dews began pacing around. Mass threw his hoodie in his car and walked around the car. Then according to Appellant, "Dews done like, 'Shit, what's up.' And I'm like, I don't know what this dude coming around the corner with, so I shot. I shoot. I mean, I don't know what else I was supposed to do. . . . That's why I shot him. Because Dews wasn't a threat. I didn't see no weapon on him. [Mass] was the one not in clear view coming from around the car. And I figured if he got the weapon, I should fire at him. [Dews is] not a threat right now."

Appellant further described his reasoning as follows:

24

I was like, Dews, if you got a problem with me, that's cool. You know, I'm a man. So if you feel like you want to handle something one on one, or you want to talk to me one on one, that's understandable. But you got another dude with you. This dude done made it to his car. Now, I can't see through his car. . . . So I don't know what he's going to the car for. I don't even know why this dude's out here. Because when we was in the mall, like I said, Dews was over here, this guy was over here [indicating distance]. So I couldn't put it together . . . I don't know the fellow. But all of a sudden I look up, and it's both of them outside. I know you got some animosity in your chest because when you come outside in the cold and you take off your shirt, I haven't said anything to you, now I'm in fear for my life. Because I don't know what you going to do. You know, I don't know what y'all are going to do.

After shooting Mass, Appellant remained at the scene and called the police. He gave his interview about an hour and a half later. Appellant was calm and collected as he recounted the events.

For a claim of fear to rise to the level of sudden passion, the defendant's mind must be rendered incapable of cool reflection. *Beltran v. State*, 472 S.W.3d 283, 295 (Tex. Crim. App. 2015). Although Appellant stated in his interview that he was in fear for his life, nothing in the record supports an inference that his mind was rendered incapable of cool reflection. On the contrary, the evidence—including Appellant's own statements to the police—suggests the opposite. We conclude that Appellant's claim of fear does not rise to the level of sudden passion.

Moreover, even if there was evidence that Appellant's mind was rendered incapable of cool reflection, the evidence could not support a finding by a rational jury that an adequate cause provoked his sudden passion. The events, even as described by Appellant in his interview, would not commonly produce such a passion in a person of ordinary temper. *See McKinney v. State*, 179 S.W.3d 565, 570 (Tex. Crim. App. 2005) (no adequate cause where victim yelled at and pushed defendant); *cf. Havard v. State*, 800 S.W.2d 195, 217 (Tex. Crim. App. 1989) (adequate cause where defendant thought he saw two men with weapons drawn approaching and one shot at him). Therefore, we conclude that the trial court did not err by refusing to submit Appellant's requested instruction on sudden passion. Accordingly, we overrule Appellant's ninth issue.

### INEFFECTIVE ASSISTANCE OF COUNSEL

In Appellant's seventh issue, he contends that his trial counsel was ineffective for failing to challenge the qualification of the State's gang expert to render an opinion that he is affiliated with a gang.

**Standard of Review and Applicable Law**

In reviewing an ineffective assistance of counsel claim, we follow the United States Supreme Court's two-pronged test in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Hernandez v. State*, 726 S.W.2d 53, 56-57 (Tex. Crim. App. 1986). Under the first prong of the *Strickland* test, an appellant must show that counsel's performance was "deficient." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. To be successful, an appellant must "show that counsel's representation fell below an objective standard of reasonableness." *Id.*, 466 U.S. at 688, 104 S. Ct. at 2064; *Tong*, 25 S.W.3d at 712.

Under the second prong, an appellant must show that the "deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; *Tong*, 25 S.W.3d at 712. The appropriate standard for judging prejudice requires an appellant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Tong*, 25 S.W.3d at 712. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Tong*, 25 S.W.3d at 712.

Review of a trial counsel's representation is highly deferential. *Tong*, 25 S.W.3d at 712. We indulge in a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. It is Appellant's burden to overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Id.*; *Tong*, 25 S.W.3d at 712. Moreover, any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Rarely is the record on direct appeal sufficiently developed to fairly evaluate the merits of a claim of ineffectiveness. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002).

Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. *Thompson*, 9 S.W.3d at 813. Appellant must prove

both prongs of the ***Strickland*** test by a preponderance of the evidence in order to prevail. ***Tong***, 25 S.W.3d at 712.

**Analysis**

At the trial on punishment, the State called Detective Chris Miller of the Tyler Police Department to testify regarding Appellant's many tattoos and the likelihood that they are gang-related. Miller testified that he was the gang intelligence officer for the department, that he was a member of the Texas Gang Investigators Association, and that he testified as an expert in the district courts in Smith and Wood Counties as well as in federal court. He stated that he had conducted training for the United States Attorney General's Office, the Texas Attorney General's Office, the University of Texas, Tyler Junior College, and the Texas Gang Investigation Association in the areas of gangs and gang intelligence. He further conducted training for the Tyler Police Department, the parole office, the probation office, and other area law enforcement agencies.

Miller testified that the State of Texas does not define what a criminal street gang member is, but rather law enforcement brings evidence to the jury to make that determination. He said that tattoos, while not determinative of the issue, are a significant factor in determining whether a person is affiliated with a gang. The State offered photographs of Appellant's tattoos. Defense counsel objected under Texas Rules of Evidence 401, 402, 403, and 705(d). In making his objections, counsel explicitly stated that he did not contest Miller's expert qualifications and that he "fully concur[red]" that Miller was an expert. The trial court overruled the objections, and the photographs were admitted.

After viewing the photographs, Miller testified that the tattoos "appear[ed] to be a constant theme of Bloods or a Blood set." He testified regarding Appellant's tattoos and what tattoos like them typically mean in the gang culture. Miller opined that, based on Appellant's tattoos, there was a high probability that he was a member of a criminal street gang called the Piru Bloods.

We have reviewed the totality of the representation and conclude that Appellant has failed to show that his counsel's actions constitute ineffective assistance of counsel. First, an isolated failure to object to certain procedural mistakes or improper evidence does not constitute ineffective assistance of counsel. ***Ingham v. State***, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984). Second, absent explanations for trial counsel's failure to object, Appellant has failed to

27

overcome the presumption that the challenged action was sound trial strategy. *See Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065; *Thompson*, 9 S.W.3d at 813. Third, Appellant has not shown any prejudice or even suggested how, but for his counsel's failure to object, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 687, 694, 104 S. Ct. at 2064, 2068; *Tong*, 25 S.W.3d at 712. Accordingly, we overrule Appellant's seventh issue.

## DISPOSITION

Having overruled Appellant's first, second, third, fourth, fifth, sixth, seventh, eighth, and ninth issues, we *affirm* the trial court's judgment.

JAMES T. WORTHEN
Chief Justice

Opinion delivered April 13, 2016.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)

28



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**APRIL 13, 2016**

**NO. 12-14-00158-CR**

**RICKY NEAL JR.,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 7th District Court
of Smith County, Texas (Tr.Ct.No. 007-0505-13)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

James T. Worthen Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*